## HUGHES *vs.* HUGHES.

[BILL IN EQUITY FOR DIVORCE.]

1. *Matrimony, dissolution of bonds of, under section* 2353 *of Revised Code; what necessary to authorize.*—To authorize a dissolution of the bonds of matrimony under section 2353 of the Revised Code, there must be, on the part of the husband, actual violence committed on the person of the wife, attended with danger to her life or health, or such conduct on his part as shows there is reasonable apprehension of such violence ; and such acts of violence, or such conduct, should be distinctly stated and clearly proved, so as to leave no reasonable doubts on the mind as to the truth of their existence, and of their tendency to endanger the life or health of the wife ; and the wife, as a general rule, should be without fault on her part.

2. *Evidence ; what insufficient to establish charge of cruel treatment and violence.*—The deposition of one witness, the sister of complainant, whose general character is proved to be bad, and who is contradicted as to a material fact by the brother of the defendant, is not sufficient to establish the charge of cruel treatment and violence, committed on the person of the wife, by the husband.

Hughes v. Hughes.

3. *Defendant's answer; for what purpose can not be looked to.*—The answer of the defendant, in such a case, can not be looked to, either to support the charges in the bill, or to sustain the deposition of a witness whose general character is shown to be bad.

4. *Absent witness, admissions of what would swear if present; force and effect of.*—Admissions, of what it is stated absent witnesses will swear, made by the plaintiff's solicitor to obtain a hearing and prevent a continuance, must be held to have the same force as the deposition of such witnesses would be entitled to have if regularly taken by the defendant.

5. *Next friend; when may be taxed with costs.*—A next friend, in whose name the bill of a wife is filed to obtain a divorce, if it be dismissed, may properly be decreed to pay the cost.

APPEAL from Chancery Court of Montgomery.
Heard before Hon. A. C. FELDER.

The facts are sufficiently stated in the opinion.

WALKER & MURPHEY, for appellant.
FALKNER & MOLTON, *contra.*

PECK, C. J.—To authorize a dissolution of the bonds of matrimony, under section 2353, there must be, on the part of the husband, actual violence committed on the person of the wife, attended with danger to her life or health, or such conduct on his part as shows there is reasonable apprehension of such violence; and such acts of violence, or such conduct, should be distinctly stated, and clearly proved, so as to leave no reasonable doubt on the mind as to the truth of their existence, and of their tendency to endanger the life, or health of the wife; and, besides, the wife should be, as a general rule, without fault on her part.

These parties were married on the 12th of January, in the year 1869, and lived together as husband and wife until the 16th day of the next March, three months and four days, when plaintiff, as she states, from fears existing in her mind of great personal violence, by the threatening conduct of defendant, was induced to leave him to secure her personal safety.

She does not state what was the character of the threatening conduct of defendant, and, consequently, no suffi-

cient reasons are disclosed to justify the plaintiff in the course she pursued in leaving her husband.

The first serious fault, therefore, as far as appears, lies at her door, and this may have had more or less influence in leading the defendant into the improper conduct, on his part, that is charged to have followed.

After the abandonment of her husband, the plaintiff states that she lived in perpetual fear and dread that he would find her, and do her great bodily harm, and for this reason she endeavored to keep the place of her residence unknown to him, that her safety might be more perfect; that at length he discovered where she was living, and on the 22d day of April, 1869, he came to her room, and in an angry tone and excited manner, said to her, "you must go with me and live with me;" that she, in a mild manner, replied: "I am afraid to live with you;" that he then, using profane language, said, "I will whip you," and, with an open knife in his hand, seized her by the arm, and brandished his knife about her head and throat, and looking like one infuriated, said: "I will cut your throat if you do not come and live with me—make up your mind to die, I will certainly kill you;" with other threats of great personal violence.

This, the plaintiff states, took place in the presence of her sister, who threatened to call for the police, and opened the door for that purpose, when defendant closed his knife and left the room; that he came the next day, and threatened to whip her.

She further charges that defendant had committed actual violence on her person, attended with danger to her life, and had been guilty of conduct towards her, from which there was reasonable apprehension of violence to her person, attended with danger to her life, but no other specific acts of violence are stated.

The defendant, in his answer, denies that the plaintiff has any reasons to apprehend violence from him. He says he admits most of the statements made in the fourth paragraph of the bill, the paragraph in which the threatening conduct, on his part, is charged, with the brandishing of his knife, &c., but says the threats were not intended to be

carried into effect, and that plaintiff knew it. He further states, that after his wife had left him, he was disposed to let her obtain a divorce, as she was desirous of doing so, but she had been advised she could not do it unless he used actual violence towards her, and for that purpose it was agreed between them that he should go to her house and act in such a way that she might sue for and obtain a divorce; that, afterwards, he ascertained she was guilty of improprieties with other men, and, thereupon, he determined not to carry out their agreement, and let her get a divorce.

The only witness that swears to any acts of violence, on the part of the defendant, is the plaintiff's sister, Bettie Dixon. Her account of defendant's conduct is as follows: "About the 1st of March, 1869, the complainant came to my house and stated that her husband had treated her badly, and that she was afraid to live with him in the country. About a week afterwards defendant came to my house; the first I saw of him he was in complainant's room; at that time there were a few cross words between them. A few days after that, he came to my house again, and in my presence he drew his open knife upon complainant, and, with his hand on her shoulder, threatened to kill her. I then told him that I would call the police. He then sat down; he several times repeated the threats in my presence."

A witness by the name of Matilda Smith, also examined by plaintiff, says, she was at the plaintiff's room, about the twenty-third of March, 1869; that defendant came there, but she did not know what his business was.

He asked complainant if she was not going to do what he wanted her to do. She told him she was not. He then told her he would make her do it. She said to him, if you can make me do it you had better try it. He then said, "damn you, I will do it." He then left the house. His manner was rude and angry.

The foregoing is all the material evidence in the record, as to the improper and cruel treatment of plaintiff by defendant; all of which took place after plaintiff, without any sufficient reasons therefor, as far as appears, abandoned the house and home of her husband.

After the answer was filed and evidence taken, the defendant, by leave of the court, filed a supplemental answer, in which he states that, after his original answer was filed, there had been forgivness on the part of plaintiff, and that she had admitted him to conjugal embraces, and that plaintiff and defendant had cohabited together as husband and wife.

The truth of this supplemental answer is substantially sustained by the deposition of defendant's brother, and as strongly denied in the deposition of said Bettie Dixon, plaintiff's sister, on a re-examination.

When the cause was called for a hearing, the defendant moved the court for a continuance, to enable him to take the depositions of several witnesses by whom, he said, he could prove that said Bettie Dixon had stated she would not, if she could avoid it, testify on the subject of the reconciliation of plaintiff and defendant, and of their cohabiting together, &c., but, that if the person got her, who was appointed to take her testimony, and did examine her, she would tell the truth, and testify that complainant and defendant did sleep together, on a certain night, about the first of October, 1869, when defendant and his brother staid all night at complainant's house; and further, defendant stated he could prove, by said witnesses, that they were acquainted with the general character of said Bettie Dixon, and that her general character was bad.

To prevent a continuance, the plaintiff's solicitor admitted the witnesses, if examined, would testify as stated by defendant.

The cause was, thereupon, heard on the bill, answers, depositions, and the admissions of the plaintiff's solicitor, as to the matters the unexamined witnesses would testify to; and the chancellor dismissed the plaintiff's bill of complaint, and decreed the costs to be paid by her next friend. The case is here, on the plaintiff's appeal; and dismissing the bill, and decreeing the costs against her next friend, are assigned for errors.

A careful examination and consideration of this whole case, satisfies me, that the chancellor rightly dismissed the plaintiff's bill of complaint,

She is herself, manifestly, not any more amiable than she should be. She leaves her husband, as far as the evidence shows, without his consent or knowledge, and without any justifiable cause for such an important and serious step in her life; and when she is requested by him to return, and live with him—for that is no doubt what he intended, and what she understood, when he asked her if she was not going to do what he wanted her to do—her own witness, Matilda Smith, says she told him she was not, and on his saying he would make her do it, instead of remaining silent, or giving a gentle answer that might have allayed his excited feelings, she tauntingly tells him, "if you can make me do it, you had better try it." If she is what she claims to be, an injured wife, this, to say the least of it, was an unwise and indiscreet answer for her to make.

If there is any one state and condition in life in which the apostolic precept should have its proper influence, it is that of husband and wife—"Bear ye one another's burdens, and so fulfill the law of Christ." But this, it is to be feared, is too seldom done now-a-days.

The present age is wonderfully demoralized on the subject of marriage and divorce. It seems to be forgotten, that marriage is a divine institution, and, therefore, imposes upon parties higher moral and religious obligations than those imposed by any mere human institution or government.

But, all this aside, the evidence of the plaintiff is of too uncertain and doubtful a character to sustain the charges of improper and cruel treatment on the part of the defendant, made against him in her bill of complaint. Her sister, the said Bettie Dixon, is the only witness that speaks of any real acts of violence, or seriously threatened violence, by the defendant to the plaintiff, and the evidence of this witness, when considered in connection with the deposition of defendant's brother in relation to the reconciliation of the parties, and the admissions of what the witnesses not examined would swear, is wholly insufficient, by itself, to authorize a decree dissolving the bonds of matrimony existing between these parties. The evidence of plaintiff's sister and of defendant's brother, owing to their relations

to the parties, and the conflict in their statements, can not be considered free from suspicion.

The admissions of what the witnesses, not examined, would state, must be held to have the same force as though sworn to by them, in depositions duly taken by the defendant. This being so, the case stands thus: The only witness whose evidence is relied upon to sustain the charges made in the bill, is, in the first place, a witness of general bad character; 2d, she stated that if examined, she would swear to a certain fact, which, when afterwards examined, she denied; and, 3d, her evidence, as to a material fact, is contradicted by the evidence of defendant's brother. This leaves the plaintiff's case without support, except from the evidence of a single witness of general bad character, and whose evidence is otherwise seriously impeached.

6. The plaintiff's case can derive no support from the admissions in the defendant's answer. For reasons of public policy, as well as by positive enactment, (Revised Code, § 2355,) the answer of a defendant in such a case, whether sworn to or not, is not permitted to be used as evidence for or against either party. But if these objections did not exist, the admissions in the answer, on the same subject, would have to be taken altogether, and then they show that the pretended violence charged was, as to these parties, no evidence at all, but was a fraudulent device, resorted to by them to deceive the court, and to enable the plaintiff to accomplish an unlawful purpose. This, if true, ought to dismiss the plaintiff's bill out of court.

Upon the whole, we are satisfied the plaintiff's complaint is without merits, and that the chancellor's decree ought to be affirmed, both in dismissing her bill of complaint and in decreeing the cost against her next friend.

The decree of the chancellor is affirmed, and the plaintiff's next friend, the said John Maxey, will pay the costs of this court and of the court below.