Argued April 12; modified May 9, 1944

# WIGGINS *v.* WIGGINS

(148 P. (2d) 793)

Before BAILEY, Chief Justice, and BELT, LUSK, BRAND and HAY, Associate Justices.

*George H. Brewster,* of Redmond (Cunning & Brewster, of Redmond, on the brief), for appellant.

*W. F. Coshow,* of Bend (DeArmond & Goodrich, of Bend, on the brief), for respondent and cross-appellant.

HAY, J.

This suit was instituted by the respondent and cross-appellant against her husband, the appellant, for dissolution of the marriage relation existing between them. The amended complaint alleged cruel and inhuman treatment. The defendant answered by general denial, and, affirmatively alleging cruel and inhuman treatment on the part of plaintiff, he prayed for a decree of judicial separation from bed and board. (Chapter 408, L. 1941.)

The parties intermarried at Weiser, Idaho, on December 4, 1937. They were hardly old enough to assume the responsibilities of marriage, Mrs. Wiggins being at that time only sixteen and Mr. Wiggins eighteen. For about a year, they lived with the husband's parents at Midvale, Idaho. This was an unsatisfactory arrangement, as is often the case. Mrs. Wiggins was unable to get along with her relatives-in-law, and, in an effort to avoid discord, the couple removed to the state of Oregon in March, 1939. A son, Tony LeRoy Wiggins, was born to them in September, 1940. Each of the parties seeks to be awarded custody of the child.

At the conclusion of the hearing and after consideration of the evidence, the trial judge intimated, in a letter to the respective attorneys, that he was of the opinion that neither party was entitled to affirmative relief. He accordingly entered a decree dismissing both the plaintiff's complaint and the defendant's cross-complaint. From this decree, both parties have appealed.

As the trial judge did not file a memorandum opinion or make findings of fact, this court is obliged to speculate to some extent as to the reasons for his decision. Evidence was introduced upon the part of

each of the parties which, if believed, would have been sufficient, we think, to have justified a decree in favor of either. We must assume, therefore, that the trial judge was of the opinion that the parties were *in pari delicto,* and hence that neither was entitled to relief in a court of equity.

The plaintiff testified that her husband struck her on two occasions, one of which was in Idaho, shortly after their marriage, and the other at Bend, in July, 1941. Neither of these incidents appeared to have made much impression upon her memory, and she seemed to be uncertain respecting the details. She admitted that she was not seriously hurt. The first alleged assault is not even mentioned in either the original or the amended complaint. She said that her husband, on two occasions, falsely accused her with having had improper relations with other men. The first time was in Idaho, when the accusation was supposed to have been made in the presence of her mother. The second was in Bend, shortly before the institution of this suit, and as to this incident we are of the opinion that the proof was insufficient. Three times, after family quarrels, she left her husband, not intending to return, but, after a longer or shorter interval, she did return. Mrs. Wiggins claims that her husband was very jealous of her, and that they quarreled over every man she looked at. She was very fond of attending dances and other social gatherings, while he, on the contrary, preferred to remain at home or to visit with a few family friends. Mr. Wiggins is a logger. His work is strenuous, and he comes home tired. He does not dance, having tried, without success, to acquire the art. Under the circumstances, he is not inclined to spend in attendance at public dances, where he might have the privilege of watching his wife dancing with other men, the time that, as he thinks, he needs

for rest. One might, perhaps, sympathize with both of these young people at this point, and it must be said, to the credit of Mrs. Wiggins, that for a time she tried to keep her desire for dancing in subordination to her wifely duties, and to observe the amenities of her situation. In the last few months of their life together, however, she formed the habit of going to dances unaccompanied by her husband. She testified that he objected to this, but that it "didn't do him any good".

In May, 1943, at a public dance, Mrs. Wiggins became casually acquainted with a soldier who was stationed at Camp Abbott, near Bend. This soldier apparently took a violent liking to her at first sight, and, before the evening was over, he asked her to divorce her husband and marry him. Whether or not Mrs. Wiggins considered seriously the soldier's sudden and unconventional proposal, at all events she told her husband about it that same night, and undoubtedly, and very naturally, he resented it. Mrs. Wiggins thereupon demanded that he consent to a divorce, and, from that time until she brought the present suit, a period of about three months, she refused to cohabit with him. She continued to live in his home and ate the food provided at his expense, but refused to cook his meals or to wash the dishes. Every day, on his return from work, he was obliged either to cook his own dinner or eat at a public restaurant.

In an endeavor to keep the marriage from going on the rocks, Wiggins raised some money by selling his car, and contracted for the purchase of a somewhat better home than the one in which the family had been living. He also did his best, but without success, to persuade Mrs. Wiggins to have nothing further to do with the soldier. She, however, insisted that she did not

love her husband, and that she intended to divorce him and marry the soldier. On the day that she filed suit, she left his home and took up her residence in the apartment of one of her aunts. This young woman (she was only twenty-three) was herself divorced, and was one of Mrs. Wiggins's most enthusiastic witnesses at the hearing of this cause.

In July, 1943, after having expressed her determination to divorce her husband, Mrs. Wiggins decided to go to Idaho to visit her grandmother. Her husband, notwithstanding their strained relationship, furnished her with the money to make this trip, and she purchased a ticket for the journey by stage from Bend to Weiser, Idaho. Evidently by prearrangement, however, she left the stage at Brothers, Oregon, which is only a few miles out of Bend, and was met there by her youthful aunt and a man friend of the latter's, who conveyed her by car to Redmond, Oregon, where she stayed overnight. Next morning she proceeded to Portland, where she remained for three days. She had taken her child with her. She claimed that it was not her intention to return to her husband, and that her reason for going to Portland was to find employment. While in Portland she stayed at two different hotels, but professed to be unable to remember the name of either of them. Thereafter, she proceeded by train to Weiser. Meanwhile, her husband had telephoned to Weiser, and had learned that his wife had not arrived there. Accompanied by plaintiff's aunt, he went to Weiser, where, on Mrs. Wiggins's arrival, they had a spirited argument. He returned to Bend, and Mrs. Wiggins promised to, and actually did, follow him there after spending a few days with her grandmother. Mr. Wiggins apparently believed that she was not telling the truth about her

Portland trip, and his counsel, in his brief, insinuates that her visit to Portland was not so innocent as she claimed. While there is no evidence to support this insinuation, it must be admitted that Mrs. Wiggins's story of that very recent occurrence was lacking in candor and not at all satisfactory.

About a week before filing her complaint herein, Mrs. Wiggins, taking the child with her, went to a party at her aunt's home. Wiggins was supposed to have left town that evening, but, being unable to get transportation, did not go. He tried to find out where Mrs. Wiggins was and inquired for her at her aunt's, but was told that she was not there. Long after midnight, her soldier friend took her and the child home in his automobile.

There was interjected into the case testimony by plaintiff's aunt to the effect that Mr. Wiggins had made improper suggestions to her, and had, on various occasions, tried to get into bed with her. This was supposed to have taken place during the time when plaintiff and defendant were living together as man and wife. Subsequent to the filing of the complaint, Mr. Wiggins, on one occasion, went to a night club near Bend, evidently for the purpose of keeping an eye on his wife. Mrs. Wiggins was there with her aunt and her soldier friend, and, as Wiggins drove up in a borrowed car, he found them trying to repair a tire on their car, from which the air had escaped. He turned his car around, and sounded his horn. Mrs. Wiggins and her aunt apparently thought that Wiggins had let the air out of their tire, and they proceeded to throw rocks at his borrowed car. Wiggins denied responsibility for their tire's condition.

During the interim between the filing of the complaint and the hearing, Wiggins seems to have instigated an investigation of his wife by a representative of the juvenile court. Apparently, the purpose was to determine Mrs. Wiggins's fitness to have custody of the child, but Wiggins tried to get the investigator to broaden the scope of his investigation so as to furnish him with evidence to be used against his wife generally, which the investigator refused to do.

After Mr. Wiggins sold his car, he deposited the sum of $869 in the Bank of Bend, in a joint account in the names of both himself and his wife, and, between June 23d and July 7, 1943, Mrs. Wiggins checked out all of this money. Counsel for Mr. Wiggins strongly urges this fact as evidence of bad faith on her part, as she had at that time admittedly formed the intention of bringing suit for divorce. However, it appears that $550 of the sum in question was expended as a down payment on a house which the parties were buying. The remainder seems to have gone for furniture and linens for the home. There is a dispute as to whether or not Wiggins authorized the purchase of all the furniture which was bought, and he testified that a part of the money was expended, without his consent, for a down payment on a fur coat for his wife. Why these expenditures were made, if Mrs. Wiggins actually intended at that time to bring suit for divorce, she did not undertake to explain.

Mr. Wiggins denied ever having beaten his wife or having been cruel to her. Apart from his manifestations of jealousy, (which no doubt, under the circumstances, were natural), we are inclined to the opinion, from the evidence, that he was a good husband. He is a hard working man, and devoted all

of his income to the support of his family. We think that the plaintiff failed to establish grounds for divorce as against him. The evidence on her part, even in cold print, lacks convincing force. Her affair with the soldier, on the other hand, was admitted by her quite frankly. We do not mean that she admitted having had illicit relations with the soldier, and, although counsel for Mr. Wiggins, in his brief, refers to the soldier as Mrs. Wiggins's paramour, we do not think that the evidence justifies the use of such a term. However, the plain fact is that Mrs. Wiggins became suddenly enamoured of the soldier, and immediately told her husband so, demanding a divorce and stating that she intended to marry the soldier. Thereafter, she refused to cohabit with her husband, although she actually resided with him in the same house for some three months before bringing suit, during which time she ate his food, spent his money for a secret and rather suspicious trip to Portland, and depleted his savings through expenditures which could have been justified only upon the basis of a continuance of the marital relationship. This court has held that it is cruel and inhuman treatment sufficient to warrant a divorce, for one spouse to tell the other that he no longer cares for her. *Neely v. Neely*, 162 Or. 610, 94 P. (2d) 300; *Steele v. Steele*, 96 Or. 630, 190 P. 716. The plaintiff not only told her husband that she does not love him, but demonstrated that fact by her actions. The defendant, however, does not seek a divorce. He says that he still loves his wife and is willing that she should return and resume her wifely duties. He asks for a decree of separation from bed and board, and we feel that, under the evidence, we cannot deny him this, at least for a limited period.

■■ Upon evidence having been given gratuitously by plaintiff's aunt, tending to show that the defendant had made improper suggestions to her, plaintiff sought leave to amend her complaint to conform to the proof in this respect. The court refused to permit this. The allowance of amendments to conform to the proof is largely discretionary. *Goff v. Elde,* 132 Or. 689, 288 P. 212. In this instance, we feel that the court's order was within its discretion.

The supplemental complaint charges that defendant, since the filing of the complaint, instituted an action at law against plaintiff to recover possession of certain personal property, without having first demanded of her the return of such property, and that such action was brought for the purpose of vexing plaintiff. To this supplemental complaint the defendant pleaded that his action to recover possession of such personal property had been commenced prior to the filing of plaintiff's supplemental complaint herein, and asked that the supplemental complaint abate. Plaintiff moved to strike the so-called plea in abatement, which motion was denied. The correctness of the court's ruling upon this, and upon other matters of pleading, is raised by plaintiff. In our opinion, however, these rulings in no manner affected the substantial rights of the plaintiff, and may be disregarded by this court. *Kaller v. Spady,* 144 Or. 206, 10 P. (2d) 1119, 24 P. (2d) 351.

■ The decree will be reversed in so far as it dismissed the cross-complaint of the defendant, and he will be awarded a decree of separation from bed and board against the plaintiff for a period of three years. In all other respects, it is affirmed. Neither party shall recover costs in this court.

The matter of custody of the child has given us some concern. After careful consideration, we have concluded that the evidence is insufficient to enable this court to determine what order should be made in this respect. The case is, therefore, remanded, with directions to the trial court, upon a further hearing, to make such order as may appear to be in the best interests of the child.